OPINION
WATFORD, Circuit Judge:
The Seattle Mideast Awareness Campaign (SeaMAC) submitted an advertisement to run on King County Metro buses in the Seattle metropolitan area. After initially accepting the ad, the County revoked its approval, concluding that displaying the ad would likely result in vandalism and violence disruptive to the bus system. We are asked to decide whether the County’s action violated SeaMAC’s First Amendment rights.
I
King County runs Metro, a public mass transit system serving hundreds of thousands of passengers in and around Seattle each day. Metro’s mission is to provide safe and reliable transportation for its customers. Like many public transit agencies, Metro helps finance its operations through an advertising program, which allows advertisers to purchase ad space on the exterior of Metro buses.
The County runs Metro’s bus advertising program through a contract with Titan Outdoor LLC. The contract contains a policy restricting advertising content. At the time of the events leading to this appeal, that policy prohibited ads for alcohol and tobacco products; ads for adult movies, video games rated for mature audiences, and other adult products and services; ads promoting illegal activity; depictions of minors or those who appear to be minors engaging in sexual activities; ads containing flashing lights or other features that might undermine safe operation of the buses or distract other drivers; and obscene, deceptive, misleading, or defamatory material. The policy also contained two “civility clauses,” §§ 6.4(D) and 6.4(E). Together, these clauses prohibited material that would foreseeably result in disruption of the transportation system or incite a response that threatens public safety.[1]
Metro required Titan to enforce these content restrictions by individually pre-screening each ad. Titan routinely rejected ads that failed to comply with the restrictions, most commonly the prohibition *494 on ads for alcohol and tobacco products. In close cases, Titan sought guidance from County officials, who then independently reviewed the proposed ad. Before this case, County officials had invoked § 6.4(D) on only one occasion, when they directed Titan to reject a series of ads with messages such as “NAZI MEDICAL ABUSE COMMITTED FOR 15 YEARS; State Hate Committed By Elected Officials & Doctors.”
In late 2010, SeaMAC, a non-profit organization opposed to United States support for Israel, proposed a Metro ad that read:
ISRAELI WAR CRIMES YOUR TAX DOLLARS AT WORK www.Stop30Billion-Seattle.org.
Titan initially approved the ad, but because it considered the ad “controversial,” the company sent a copy to County officials, who also approved the ad. Those officials in turn forwarded the ad to the King County Executive, who agreed that while the ad was controversial, it did not violate Metro’s bus advertising policy. Titan slated the ad to run on 12 Metro buses for four weeks, beginning in the last week of 2010. SeaMAC’s contract with Titan, however, provided that the ad could still be withdrawn if the County disapproved it.
Before the ad ran, a local television station broadcast a news story about the ad’s approval, which provoked an unprecedented, hostile response. Metro’s Call Center, accustomed to managing an average of 50 to 80 emails per day, received 6,000 emails over the span of ten days, almost all of them urging the County to pull the ad. The messages varied in tenor, but several expressed an intent to vandalize buses or disrupt service. For example, one message said: “AN ATTY WHO SAYS THE SIGNS ARE PERMITTED UNDER THE FIRST AMENDMENT IS FORCING ME TO CONDUCT VIOLENCE JUST TO PROVE THAT I AM REALLY UPSET AT THESE HORRIBLE WORLD WAR2 KINDS OF HATRED SIGNS.” Another stated, “I think I will organize a group to ‘riot’ at your bus stops.” Metro’s Call Center also received a deluge of angry telephone calls. One repeat caller promised to block a tunnel to stop buses from running, while another said that “Jews would take physical action” to prevent the ads from going up.
A few days after the story ran, photographs depicting dead or injured bus passengers and damaged buses-the aftermath of apparent terrorist attacks-appeared under the door of the Metro Customer Service Center. The names of County officials and the phrase “NO TO BUS ADS FOR MUSLIM TERRORISTS” were scrawled across them. The Metro Deputy Director interpreted these photos as “a threat of harm toward Metro or an expression of outrage over the SeaMAC ad, or both.”
Not all of the feedback expressed anger. Many customers expressed safety concerns, fearing, for example, “racially motivated attacks on Jewish and Israeli riders.” The mother of a 13-year-old boy asked whether her son, who wore a yarmulke and rode the bus home from school several times a week, would be able to ride safely. A blind woman, who relied on the bus system as her only means of transportation, said she agreed with SeaMAC’s “agenda,” but wanted the ad pulled so she could travel without fear of violence. Metro bus drivers also expressed safety concerns. Some refused to drive buses displaying the ad; others asked the union president to stop the ad because they feared it would put them “in harm’s way.”
As the uproar mounted, Metro employees became unable to read or listen to each message, much less respond to all of them. *495 Metro officials tried to identify the most disturbing emails and phone calls for purposes of investigation by law enforcement. This process brought Metro’s internal operations to a halt. The Call Center had to set aside customer inquiries of the more routine sort, while the Deputy Director could not use her flooded email account to do any other work. Metro Transit Police and the Operations Section of Metro began planning for a potentially violent and disruptive reaction to SeaMAC’s ad, a reaction they anticipated would be targeted at buses and their passengers. That threat wasn’t covered by the existing security protocol because, as Metro’s Operations Manager stated, it represented “a totally new and different situation that we [had not] confronted before.” The bus drivers’ concerns added to these operational challenges.
Four days after the news story broke (but before SeaMAC’s ad was scheduled to run), two pro-Israel groups — the Horowitz Freedom Center (HFC) and the American Freedom Defense Initiative/Stop Islamization of America (AFDI) — entered the fray by submitting their own ads. The HFC ad read:
PALESTINIAN WAR CRIMES YOUR TAX DOLLARS AT WORK
One version depicted a burning bus, while the other showed injured, bloody passengers in a damaged bus. The AFDI ads contained seven different images, including one of Adolf Hitler, along with the text:
IN ANY WAR BETWEEN THE CIVILIZED MAN AND
THE SAVAGE, SUPPORT THE CIVILIZED MAN.
Support Israel, Defeat Islamic Jihad
SeaMAC’s ad, and the counter-ads, were thus pending before the County at the same time.
Shortly thereafter, the King County Sheriff contacted the King County Executive to advise against running the SeaMAC ad. She worried that “buses, and bus-passengers, were vulnerable to spontaneous, emotion driven attacks, like thrown rocks or bricks.” Seeking advice, the County Executive contacted the United States Attorney for the Western District of Washington, who advised caution in light of the fact that public transit systems were “targets of choice” for terrorists.
After unsuccessfully asking SeaMAC to withdraw its proposed ad, the County Executive withdrew his approval of Sea-MAC’s ad and, at the same time, rejected the HFC and AFDI ads. The County Executive explained that “the context had changed dramatically” and that all of the pending ads on the Israeli-Palestinian conflict were non-compliant with §§ 6.4(D) and 6.4(E). Metro simultaneously revised its advertising policy to exclude all political or ideological ads from that point forward.
SeaMAC sued the County under 42 U.S.C. § 1983, alleging a violation of its First Amendment rights. The district court denied SeaMAC’s motion for a preliminary injunction requiring the County to run its ad, and SeaMAC chose not to take an interlocutory appeal. Following discovery, the district court granted the County’s motion for summary judgment, reasoning that the County’s exclusion of SeaMAC’s ad did not violate the First Amendment because Metro’s bus advertising program created a limited public forum and the County’s decision to exclude the ad was reasonable and viewpoint neutral.
II
SeaMAC contends it has a First Amendment right to use government property— the sides of Metro buses — to promote its message. To resolve that issue, we must first determine whether the sides of Metro *496 buses are a forum for public expression and, if so, which type of forum.
The parties agree that Metro’s bus advertising program creates a forum of some sort, as the County has opened the sides of Metro buses to speakers other than the government itself. See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). The more difficult question is determining which type of forum the County has created. The Supreme Court has classified forums into three categories: traditional public forums, designated public forums, and limited public forums. Int’l Soc’y for Krishna Consciousness, Inc. v. Lee (ISKCON), 505 U.S. 672, 678-79, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).[2] In traditional and designated public forums, content-based restrictions on speech are prohibited, unless they satisfy strict scrutiny. Pleasant Grove, 555 U.S. at 469-70, 129 S.Ct. 1125. In limited public forums, content-based restrictions are permissible, as long as they are reasonable and viewpoint neutral. See id. at 470, 129 S.Ct. 1125.
Metro’s bus advertising program isn’t a traditional public forum. That category encompasses places like “streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.” Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (internal quotation marks omitted). The question, then, is whether Metro’s bus advertising program is a designated public forum. If not, the rules governing limited public forums apply.
The government creates a designated public forum when it intends to make property that hasn’t traditionally been open to assembly and debate “generally available” for “expressive use by the general public or by a particular class of speakers.” Arkansas Educ. Television Comm’n v. Forbes, 523 U.S. 666, 677-78, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). The defining characteristic of a designated public forum is that it’s open to the same “indiscriminate use,” Perry, 460 U.S. at 47, 103 S.Ct. 948, and “almost unfettered access,” Forbes, 523 U.S. at 678, 118 S.Ct. 1633, that exist in a traditional public forum. The principal difference between traditional and designated public forums is that the government may close a designated public forum whenever it chooses, but it may not close a traditional public forum to expressive activity altogether. Perry, 460 U.S. at 45-46, 103 S.Ct. 948. Otherwise, the two are treated the same: When the government creates a designated public forum by imbuing its property with the “essential attributes of a traditional public forum,” Pleasant Grove, 555 U.S. at 469, 129 S.Ct. 1125, it is “bound by the same standards as apply in a traditional public forum.” Perry, 460 U.S. at 46, 103 S.Ct. 948.
To determine whether the government has imbued its property with the essential attributes of a traditional public forum, we focus on the government’s in *497 tent. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).' The government does not create a designated public forum through inaction or by permitting only limited discourse. Id. Instead, the government must intend to grant “general access” to its property for expressive use, either by the general public or by a particular class of speakers. Forbes, 523 U.S. at 679, 118 S.Ct. 1633; see also Widmar v. Vincent, 454 U.S. 263, 267-68, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (designated public forum created for student groups). In contrast, when the government intends to grant only “selective access,” by imposing either speaker-based or subject-matter limitations, it has created a limited public forum. Forbes, 523 U.S. at 679, 118 S.Ct. 1633; Cornelius, 473 U.S. at 806, 105 S.Ct. 3439.
We rely on several factors to gauge the government’s intent. Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. We look first to the terms of any policy the government has adopted to govern access to the forum. Id. If the government requires speakers seeking access to obtain permission, under pre-established guidelines that impose speaker-based or subject-matter limitations, the government generally intends to create a limited, rather than a designated, public forum. Forbes, 523 U.S. at 679-80, 118 S.Ct. 1633; Cornelius, 473 U.S. at 804, 105 S.Ct. 3439; Perry, 460 U.S. at 47, 103 S.Ct. 948. Granting selective access in that fashion negates any suggestion that the government intends to open its property to the “indiscriminate use by all or part of the general public” necessary to create a designated public forum. Hills v. Scottsdale Unified Sch. Dist. No. 18, 329 F.3d 1044, 1050 (9th Cir.2003) (per curiam); see also Forbes, 523 U.S. at 679, 118 S.Ct. 1633; Perry, 460 U.S. at 47, 103 S.Ct. 948.
Two other factors help us ascertain the government’s intent. If the government has adopted a policy governing access to the forum, we examine how that policy has been implemented in practice. Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. If the policy requires speakers to obtain permission under guidelines whose terms are routinely ignored, such that in practice permission is granted “as a matter of course to all who seek [it],” the government may have created a designated public forum. Perry, 460 U.S. at 47, 103 S.Ct. 948. We also take into account the nature of the government property at issue. Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. If the property is “designed for and dedicated to expressive activities,” id. at 802-03, 105 S.Ct. 3439, courts will more readily infer the intent to create a designated public forum. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theater). On the other hand, if the property is used primarily as part of a government-run commercial enterprise, and the expressive activities the government permits are only incidental to that use, that fact tends to support finding a limited public forum. See ISKCON, 505 U.S. at 682, 112 S.Ct. 2701 (airport terminal); Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (public transit system).
Applying these three factors here, we think it’s clear the County intended to create a limited, rather than a designated, public forum. First, the County adopted a formal policy requiring everyone seeking access to Metro’s bus advertising program to obtain permission through a pre-screening process. The policy established fixed guidelines that imposed categorical subject-matter limitations, excluding (for example) ads for alcohol and tobacco products and ads for adult-oriented products *498 and services. Collectively, the policy’s exclusions indicate that the County intended to grant only “selective access,” rather than “almost unfettered access,” to its bus advertising program. Forbes, 523 U.S. at 678-79, 118 S.Ct. 1633.
Second, the County’s implementation of the policy confirms its intent to grant only selective access. The record establishes that the County pre-screened all proposed ads and consistently rejected ads that were non-compliant. No evidence suggests that, notwithstanding the formal terms of its policy, the County granted permission “as a matter of course to all who seek [it].” Perry, 460 U.S. at 47, 103 S.Ct. 948. That fact distinguishes this case from Hopper v. City of Pasco, 241 F.3d 1067 (9th Cir.2001), where we held that the city had created a designated public forum for the display of artwork at Pasco’s city hall. There, the city “retained no substantive control over the content of the arts program” and had never previously excluded a work for any reason, even though some of the accepted works didn’t comply with the city’s policy. Id. at 1078. Here, in contrast, the undisputed evidence establishes that the County has consistently rejected proposed ads that fail to comply with the bus advertising program’s subject-matter limitations. “By consistently limiting ads it saw as in violation of its policy,” the County “evidenced its intent not to create a designated public forum.” Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d 65, 78 (1st Cir.2004); see also Arizona Life Coal. Inc. v. Stanton, 515 F.3d 956, 970 (9th Cir.2008).
When analyzing implementation of the County’s access policy at this stage of the analysis, we focus on the County’s enforcement of the policy as a whole, not-just the specific provision invoked to exclude the ads at issue. We are asking whether the forum as a whole is a designated public forum, not whether § 6.4(D) itself has created one. Thus, that the County had rejected proposed ads under § 6.4(D) on only one prior occasion is not determinative. For forum-classification purposes, the relevant question is whether the County has granted generalized access to the forum as a matter of course by routinely accepting even non-compliant ads, notwithstanding the terms of its access policy. No evidence in the record supports that conclusion here.
Finally, the third factor — the nature of the government property — also supports the conclusion that the County intended to create a limited public forum. The principal purpose of the bus advertising program is to generate revenue for the bus system. The expressive activities the city permits are therefore “incidental to the provision of public transportation,” and “a part of the commercial venture.” Lehman, 418 U.S. at 303, 94 S.Ct. 2714 (plurality opinion). As with any business, when the government is engaged in commerce, “allowing certain expressive activity might harm advertising sales or tarnish business reputation.” Hopper, 241 F.3d at 1081. For that reason, use of the property , as part of a commercial enterprise is generally incompatible with granting the public unfettered access for expressive activities. See Cornelius, 473 U.S. at 804, 105 S.Ct. 3439. We would therefore be reluctant to infer that the County intended to open the sides of Metro buses to all comers absent clear indications of such an intent. See id. We find none here.
We thus hold that Metro’s bus advertising program is a limited public forum. We recognize that other courts have held that similar transit advertising programs constitute designated public fo *499 rums.[3] Some of those courts, in our view, mistakenly concluded that if the government opens a forum and is willing to accept political speech, it has necessarily signaled an intent to create a designated public forum. See, e.g., New York Magazine v. Metropolitan Transp. Auth., 136 F.3d 123, 130 (2d Cir.1998); Lebron v. Washington Metro. Area Transit Auth., 749 F.2d 893, 896 & n. 6 (D.C.Cir.1984). Neither the First Amendment nor the Supreme Court’s public forum precedents impose that categorical rule. Any such rule would undermine the Court’s efforts to “encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all.” Forbes, 523 U.S. at 680, 118 S.Ct. 1633. Municipalities faced with the prospect of having to accept virtually all political speech if they accept any — regardless of the level of disruption caused — will simply close the forum to political speech altogether. First Amendment interests would not be furthered by putting municipalities to that all-or-nothing choice. Doing so would “result in less speech, not more”— exactly what the Court’s public forum precedents seek to avoid. Id.
Our holding that the sides of Metro buses are a limited public forum does not mean the government may impose whatever arbitrary or discriminatory restrictions on speech it desires. As discussed in the next section, for the period in which the government elects to keep open the limited public forum, any subject-matter or speaker-based limitations must still be reasonable and viewpoint neutral.
III
Having concluded that Metro’s bus advertising program is a limited public forum, we must next decide whether the subject-matter limitation invoked to exclude SeaMAC’s ad is valid. The County justified exclusion of the ad under §§ 6.4(D) and 6.4(E) of its access policy. We conclude that the County’s application of § 6.4(D) was reasonable and viewpoint neutral, and therefore have no occasion to address the validity' of § 6.4(E).
A
A subject-matter or speaker-based exclusion must meet two requirements to be reasonable in a limited public forum. First, it must be “reasonable in light of the purpose served by the forum.” Cornelius, 473 U.S. at 806, 105 S.Ct. 3439. This requirement focuses on whether the exclusion is consistent with “limiting [the] forum to activities compatible with the intended purpose of the property.” Perry, 460 U.S. at 49, 103 S.Ct. 948; see also DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 967 (9th Cir.1999). Second, exclusions must be based on a standard that is definite and objective. ■ That requirement has been developed most prominently in the context of time, place, and manner restrictions in traditional public forums, see, e.g., Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 132-33, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), but it applies with equal force in this context. See Hopper, 241 F.3d at 1077.
*500 Section 6.4(D) meets both requirements. It excludes speech that “is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.” That exclusion is consistent with limiting the bus advertising program to speech that is “compatible with the intended purpose of the property.” Perry, 460 U.S. at 49, 103 S.Ct. 948. The intended purpose of the property at issue here-^-Metro buses — is to provide safe and reliable public transportation. Any speech that will foreseeably result in harm to, disruption of, or interference with the transportation system is, by definition, incompatible with the buses’ intended purpose. See Children of the Rosary v. City of Phoenix, 154 F.3d 972, 979 (9th Cir.1998). Restrictions on speech that will foreseeably disrupt the intended function of government property have generally been held reasonable in limited public forums. See, e.g., ISKCON, 505 U.S. at 683-84, 112 S.Ct. 2701; United States v. Kokinda, 497 U.S. 720, 732-33, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion); Perry, 460 U.S. at 51-52 & n. 12, 103 S.Ct. 948. We see no justification for refusing to apply that general rule here.
The standard established by § 6.4(D) is also sufficiently definite and objective to prevent arbitrary or discriminatory enforcement by County officials. The Supreme Court has held an analogous standard (albeit one developed in a different First Amendment context) sufficiently definite and objective to pass constitutional muster. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Court concluded that school officials may exclude student speech if the speech qould reasonably lead to “substantial disruption of or material interference with school activities.” Id. at 514, 89 S.Ct. 733. That standard is constitutionally adequate to limit the discretion of school officials, the Court later held, because “the prohibited disturbances are easily measured by their impact on the normal activities of the school.” Grayned v. City of Rockford, 408 U.S. 104, 112, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). We think the same can be said of § 6.4(D). Because its standard is tied to disruption of or interference with the normal operations of the transit system, § 6.4(D) supplies courts with a sufficiently definite and objective benchmark against which to judge the “disruption” assessments made by County officials.
We acknowledge that, standing alone, § 6.4(D)’s reference to material that is “objectionable under contemporary community standards” would be too vague and subjective to be constitutionally applied. But, as we observed in Hopper, “community standards of decency” may play a role in the regulation of limited public forums, so long as such standards are “reduced to objective criteria set out in advance.” 241 F.3d at 1080. Section 6.4(D)’s ultimate criterion is an objective one: reasonably foreseeable harm to, disruption of, or interference with the transportation system. Thus, we are not left with the specter of a “standardless standard” whose application will be immune from' meaningful judicial review. Id.
SeaMAC contends that the County’s application of § 6.4(D) is unconstitutional because SeaMAC’s proposed ad does not actually violate § 6.4(D). In particular, SeaMAC argues that the threat of disruption posed by its ad was merely “speculative,” and that the County’s attempts to organize a law enforcement response plan indicated any threat could have been “neutralized.” We must independently review the record, without deference to *501 the threat assessment made by County officials, to determine whether it “show[s] that the asserted risks were real.” Sam-martano v. First Judicial Dist. Court, 303 F.3d 959, 967 (9th Cir.2002), abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
We agree with the district court that the threat of disruption here was real rather than speculative. The County identified three types of potential disruption, each of which is supported by the record: (1) vandalism, violence, or other acts endangering passengers and preventing the buses from running; (2) reduced ridership because of public fear of such endangerment; and (3) substantial resource diversion from Metro’s day-today operations. As discussed earlier, the County received numerous threats to vandalize or block Metro buses, which were sufficiently credible to cause Metro to seek the advice of law enforcement. In addition, riders and drivers threatened not to ride or drive, citing legitimate safety concerns generated by the negative reaction to SeaMAC’s proposed ad. And Metro had to divert substantial resources away from its normal day-to-day operations in order to address those safety concerns. Taken together, we think these facts establish that, if permitted to run, SeaMAC’s ad would foreseeably have resulted in “harm to, disruption of, or interference with the transportation system,” as § 6.4(D) requires.[4]
The record does not support Sea-MAC’s alternative contention that the threat of disruption could have been neutralized by implementation of a law enforcement response plan. But even if Sea-MAC were right on that score, it would not change the outcome. We do not apply a least restrictive means test in this context. See Sammartano, 303 F.3d at 967. “The Government’s decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation.” Cornelius, 473 U.S. at 808, 105 S.Ct. 3439. We believe the County’s decision to reject Sea-MAC’s ad was indeed reasonable, given the serious threat of disruption running the ad would have posed.
SeaMAC argues that there are material factual disputes as to the seriousness of the disruption threat, but that argument misapprehends the summary judgment standard. All agree as to the existence and content of the calls and emails the County received and the operational burdens they imposed. The disputes that exist relate not to the facts, but to the legal conclusions to be drawn from those facts. See Ridley, 390 F.3d at 71. The district court correctly concluded that the County’s exclusion of SeaMAC’s proposed ad was reasonable as a matter of law.
B
In addition to being reasonable, the government’s exclusion of speech from a limited public forum must be viewpoint neutral. Pleasant Grove, 555 U.S. at 470, 129 S.Ct. 1125. On its face, at least, § 6.4(D) is viewpoint neutral: It excludes all ads — whatever their viewpoint — that may foreseeably result in harm to, disrup *502 tion of, or interference with the transportation system. But that does not foreclose SeaMAC’s claim that the County applied § 6.4(D) in a viewpoint-discriminatory manner. See Rosenbaum v. City & Cnty. of San Francisco, 484 F.3d 1142, 1158 (9th Cir.2007). Prevailing on this as-applied claim requires evidence that the government intended to “suppress expression merely because public officials oppose the speaker’s view.” Perry, 460 U.S. at 46, 103 S.Ct. 948; see also Cornelius, 473 U.S. at 806, 105 S.Ct. 3439. After carefully reviewing the record, we conclude that no reasonable jury could find that County officials rejected SeaMAC’s ad because they opposed SeaMAC’s views on the Israeli-Palestinian conflict.
We begin by recapping the sequence of events that led to the County’s rejection of SeaMAC’s ad. A local news broadcast about SeaMAC’s proposed ad sparked an intense controversy that became the subject of international attention. This materially increased the risk of physical violence and consequent harm to Metro buses and their passengers. Four days after the publicity surrounding SeaMAC’s proposed ad began, two pro-Israel groups — HFC and AFDI — proposed inflammatory counter-ads of their own promoting the opposite viewpoint of SeaMAC’s ad. Faced with the choice between protecting the bus system and displaying competing ads on a conflict that has provoked deadly violence, the County simultaneously rejected all pending ads on the Israeli-Palestinian conflict pursuant to § 6.4(D). As the County Executive explained, he rejected all the ads “at the same time” because, in his view, the counter-ads were “at least as likely to elicit a response that would result in harm to our transit system as the Sea-MAC ad.” In effect, the County decided that, given the threat of disruption posed to the transit system, the County could not safely run ads on either side of the Israeli-Palestinian conflict.
The County’s decision to reject SeaMAC’s ad as part of a single, blanket decision to reject all submitted ads on the Israeli-Palestinian conflict negates any reasonable inference of viewpoint discrimination. To be sure, excluding all speech on a particular subject — whatever the viewpoint expressed — is content discrimination, but it’s not viewpoint discrimination. Content discrimination is generally forbidden in a traditional or designated public forum, but it’s permissible in a limited public forum, which is what we are dealing with here. Kokinda, 497 U.S. at 735, 110 S.Ct. 3115 (plurality opinion); Cornelius, 473 U.S. at 809-10, 105 S.Ct. 3439; Perry, 460 U.S. at 52, 103 S.Ct. 948. In a limited public forum, the government may impose content-based restrictions on speech as a “means of ‘insuring peace’ ” and “avoiding controversy that would disrupt” the business of thé forum. Cornelius, 473 U.S. at 809-10, 105 S.Ct. 3439. That is all the County did here.
The “heckler’s veto” concerns raised by the dissent would be troubling in a traditional or designated public forum, but they do not carry the same weight in a limited public forum. Excluding speech based on “an anticipated disorderly or violent reaction of the audience” is a form of content discrimination, generally forbidden in a traditional or designated public forum. Rosenbaum, 484 F.3d at 1158. In a limited public forum, however, what’s forbidden is viewpoint discrimination, not content discrimination. That does not mean “heckler’s veto” concerns have no relevance in a limited public forum: A claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker’s point of view. That might be the case, for example, where the assert *503 ed fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed.
As we have explained, in this case the County’s fears were real and substantial, and the County rejected speech from opposing sides of the Israeli-Palestinian conflict. In addition, Metro had previously run ads with the same viewpoint as Sea-MAC’s ad, when doing so had not presented a reasonably foreseeable threat of disruption. These facts confirm that the County’s asserted fear of disruption was not used as a mere pretext for discriminating against SeaMAC because of the point of view it wished to express.
Because the County simultaneously rejected all of the proposed ads on the Israeli-Palestinian conflict — from opposing viewpoints — no reasonable jury could find that it engaged in viewpoint discrimination. The record instead supports a viewpoint-neutral content-based limitation, which the County imposed after scrupulously considering whether it could “have this public discussion take place in a way that didn’t present the dangers [it was] seeing.”
King County created a limited public forum when it opened the sides of Metro buses to advertising from outside speakers. The County’s decision to reject Sea-MAC’s ad was both reasonable and viewpoint neutral, and thus did not violate the First Amendment. We affirm the district court’s entry of summary judgment in the County’s favor, and dismiss the County’s conditional cross-appeal as moot.
AFFIRMED in part; DISMISSED in part.

. Section 6.4(D) prohibited: “Any material that is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.” Section 6.4(E) prohibited: "Any material directed at a person or group that is so insulting, degrading or offensive as to be reasonably foreseeable that it will incite or produce imminent lawless action in the form of retaliation, vandalism or other breach of public safety, peace and order.”

. We will refer to this last category as “limited public forums,” Christian Legal Soc’y Chapter of Univ. of Cal., Hastings Coll, of Law v. Martinez, 561 U.S. 661, 679 n. 11, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010), although in past cases they’ve sometimes been labeled "nonpublic” forums. E.g., Arkansas Educ. Television Comm’n v. Forbes, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir.2001). The label doesn't matter, because the same level of First Amendment scrutiny applies to all forums that aren’t traditional or designated public forums.

. See, e.g., United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg’l Transit Auth., 163 F.3d 341 (6th Cir.1998); Christ’s Bride Ministries, Inc. v. Southeastern Penn. Transp. Auth., 148 F.3d 242 (3d Cir.1998); New York Magazine v. Metropolitan Transp. Auth., 136 F.3d 123 (2d Cir.1998); Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth., 767 F.2d 1225 (7th Cir.1985); Lebron v. Washington Metro. Area Transit Auth., 749 F.2d 893 (D.C.Cir.1984).

. That the anticipated disruption had not actually materialized by the time the County acted is irrelevant. Section 6.4(D) requires only a "reasonably foreseeable” threat of disruption, a standard that is constitutionally permissible in this context. The government may not manufacture a fear of disruption as a pretext to censor speech it dislikes. But where the threat of disruption is real, the government "need not wait until havoc is wreaked” before excluding potentially disruptive speech from a limited public forum. Cornelius, 473 U.S. at 810, 105 S.Ct. 3439; see also Perry, 460 U.S. at 52 n. 12, 103 S.Ct. 948.