FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER; ROBERT SPENCER, *Plaintiffs-Appellants*, | No. 17-35897 D.C. No. 2:13-cv-01804-RAJ |
| v. | |
| KING COUNTY, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted August 29, 2018
Seattle, Washington

Filed September 27, 2018

Before: Michael Daly Hawkins, Susan P. Graber,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Graber

# SUMMARY[*]

## Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in an action brought under 42 U.S.C. § 1983 alleging that King County unconstitutionally refused to display plaintiffs' submitted ads concerning global terrorism on the exterior of its public buses.

King County accepts ads for public display unless they contain certain categories of prohibited content, including false statements, disparaging material, and content that may disrupt the transit system. Plaintiffs submitted an ad concerning global terrorism that contained, in the County's view, all three types of prohibited content. Plaintiffs then submitted a revised, factually accurate ad, which the County rejected under the remaining two categories.

The panel first determined that the County's bus advertising program was a nonpublic forum. The panel held that the County permissibly rejected the factually inaccurate ad because the First Amendment does not require the County to display patently false content in a nonpublic forum. The panel further held that the County's rejection of the revised ad did not withstand scrutiny. Applying *Matal v. Tam*, 137 S. Ct. 1744 (2017), the panel held that the County's disparagement standard discriminates, on its face, on the basis of viewpoint. Finally, the panel held that the disruption

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

standard was facially valid but that, on this record, the County unreasonably applied the standard to plaintiffs' ad.

## COUNSEL

Robert Joseph Muise (argued), American Freedom Law Center, Ann Arbor, Michigan; David Yerushalmi, American Freedom Law Center, Washington, D.C.; for Plaintiffs-Appellants.

David J. Hackett (argued), Senior Deputy Prosecuting Attorney, Civil Division Appellate Chair, King County Prosecuting Attorney's Office, Seattle, Washington, for Defendant-Appellee.

Eugene Volokh, Attorney; Matthew Delbridge, Terran Hause, and Cheannie Kha, Law Students; Scott & Cyan Banister First Amendment Clinic, UCLA School of Law, Los Angeles, California; for Amicus Curiae Pennsylvania Center for the First Amendment.

## OPINION

GRABER, Circuit Judge:

King County provides public transportation in the greater Seattle metropolitan area. The County finances its transit operations in part by selling advertising space on the exterior of buses. Although many municipalities restrict advertising to commercial publicity, King County accepts all ads that do not contain specified categories of prohibited content. This case requires us to consider three of those categories: false

statements, disparaging material, and content that may disrupt the transit system. Plaintiffs American Freedom Defense Initiative, Pamela Geller, and Robert Spencer submitted an ad concerning global terrorism that contained, in the County's view, all three types of prohibited content. Plaintiffs then submitted a revised, factually accurate ad, which the County rejected under the remaining two categories. Plaintiffs brought this action under 42 U.S.C. § 1983, alleging that the County unconstitutionally refused to display their ads. The district court granted summary judgment to the County, and Plaintiffs timely appeal.

Reviewing de novo, *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1171 (9th Cir. 2018), we affirm in part and reverse in part. The County permissibly rejected the factually inaccurate ad because the First Amendment does not require the County to display patently false content in a nonpublic forum. But the County's rejection of the revised ad does not withstand scrutiny. Applying *Matal v. Tam*, 137 S. Ct. 1744 (2017), we hold that the County's disparagement standard discriminates, on its face, on the basis of viewpoint. Finally, the disruption standard is facially valid but, on this record, we conclude that the County unreasonably applied the standard to Plaintiffs' ad.

## FACTUAL AND PROCEDURAL HISTORY

In 2013, the United States Department of State submitted the following ad to King County's transit agency, Metro:



Metro approved the ad without fanfare, and it appeared on Metro's buses for nearly three weeks starting on June 6, 2013. The ad eventually drew the attention of a few members of the public. Metro received two letters from community leaders expressing concern that the ads would lead to more hate crimes, a letter from a member of Congress along the same lines, and two complaints from Metro-area residents who worried that the ads were "incendiary" and "inflammatory." Metro began a process of reevaluating its approval but, before the reevaluation concluded, the State Department voluntarily retracted the ad.[1]

About a month later, Plaintiffs submitted their own ad, modeled on the State Department's placard:



Metro rejected Plaintiffs' ad, concluding that it failed to comply with three substantive criteria of Metro's transit advertising policy. In Metro's view, the ad made false statements; it contained demeaning or disparaging content; and it foreseeably would harm or disrupt the transit system.

---

[1] In August 2013, the American Civil Liberties Union of Washington hosted a meeting at which community members expressed concern that the State Department's now-retracted ad "left viewers with the false impression that the look of terrorism is exclusive to people of Middle Eastern and Asian descent and that people of Middle Eastern or South Asian descent should be feared and that the particular use of imagery in the ads promoted stereotyping."

Metro's advertising policy prohibits all three categories of content (and eight additional categories not at issue here).

Plaintiffs then filed this action, under 42 U.S.C. § 1983, alleging that Metro's rejection of the ad violated the First and Fourteenth Amendments. The district court denied Plaintiffs' motion for a preliminary injunction, and Plaintiffs appealed. In a published opinion, we affirmed the district court's denial of a preliminary injunction. *Am. Freedom Def. Initiative v. King County (AFDI)*, 796 F.3d 1165, 1173 (9th Cir. 2015).

We held that Metro's transit advertising program is a nonpublic forum and that, accordingly, Metro's substantive criteria must be reasonable and viewpoint neutral. *Id.* at 1169–70. We assessed the factual accuracy of the ad as follows:

> Plaintiffs' proposed ad states, in prominent text: "The FBI Is Offering Up To $25 Million Reward If You Help Capture One Of These Jihadis." That statement is demonstrably and indisputably false. The FBI is not offering a reward up to $25 million for the capture of one of the pictured terrorists. The FBI is not offering rewards at all, and the State Department offers a reward of at most $5 million, not $25 million, for the capture of one of the pictured terrorists. Plaintiffs do not, and cannot, refute those basic facts.

*Id.* at 1171 (footnote and paragraph break omitted). We concluded that Metro's application of its falsity prohibition was likely both reasonable and viewpoint neutral. *Id.* at 1171–72. The false statements were indisputable, patent, and

easily correctable, undermining any argument that Metro secretly harbored an unconstitutional motive. *Id.* We expressly declined to assess Metro's other two grounds for rejection: disparagement and disruption to the transit system. *Id.* at 1172. Because Plaintiffs were unlikely to succeed on the merits and because the other relevant factors disfavored a preliminary injunction, we concluded that the district court did not abuse its discretion in declining to issue a preliminary injunction. *Id.* at 1172–73.

After our decision, Plaintiffs submitted for approval a revised ad:



The revised version is substantially the same as the original, but it no longer includes false statements. Metro rejected the new ad on two grounds: disparagement and disruption to the transit system. Plaintiffs filed an amended complaint, challenging Metro's rejection of both the original and revised ads as a violation of their right to free speech under the First Amendment.[2] After discovery, the parties filed cross-motions

---

[2] In their amended complaint, as in the original complaint, Plaintiffs alleged that Metro's rejection also violated their rights under the Fourteenth Amendment. On appeal, Plaintiffs briefly mention those claims as issues presented for review, but Plaintiffs do not substantiate the assertions with adequate briefing. Accordingly, those claims are waived. *See, e.g.*, *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived."); *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 n.1 (9th Cir. 1995)

for summary judgment. The district court granted summary judgment to the County on all counts, and Plaintiffs timely appeal.

## DISCUSSION

Metro's bus advertising program is a nonpublic forum (also called a limited public forum). *AFDI*, 796 F.3d at 1170; *Seattle Mideast Awareness Campaign v. King County (SeaMAC)*, 781 F.3d 489, 498 (9th Cir. 2015). Accordingly, strict scrutiny does not apply; instead, "Metro's rejection of Plaintiffs' advertisement[s] must be reasonable and viewpoint neutral." *AFDI*, 796 F.3d at 1170. We assess the reasonableness of a rejection in three ways: (1) by asking whether the rejection is reasonable in light of the forum's purpose; (2) by asking whether Metro's standard is sufficiently definite and objective to prevent arbitrary or discriminatory enforcement by County officials; and (3) by reviewing the record independently to determine whether the record supports Metro's conclusion. *Id.* at 1169–71. In considering viewpoint neutrality, we determine whether Metro's standard discriminates, on its face or as applied to the specific ad, on the basis of viewpoint. *Id.* at 1171.

### A. *Falsity Standard*

The falsity clause in Metro's transit advertising policy states that Metro will reject any ad that is:

---

("Although the issue . . . is summarily mentioned in [the appellant's] opening brief, it has not been fully briefed, and we therefore decline to address it.").

> *False or Misleading.* Any material that is or
> that the sponsor reasonably should have
> known is false, fraudulent, misleading,
> deceptive or would constitute a tort of
> defamation or invasion of privacy.

In the earlier appeal, we explained at length why Plaintiffs
were unlikely to succeed on their challenge to Metro's
rejection of their original, factually inaccurate ad. We held
that the falsity standard, facially and as applied to Plaintiffs'
ad, was likely both reasonable and viewpoint neutral. *Id.* at
1170–72. Having reviewed the full factual record and having
carefully considered the parties' arguments, we adopt our
earlier, tentative analysis as our final analysis: The falsity
standard meets constitutional scrutiny, both facially and as
applied.

Falsity is a reasonable standard in light of the purpose of
the transit system. *Id.* at 1170. The falsity standard is
definite and objective, at least as applied to Plaintiffs'
patently false ad. *Id.* at 1170–71. The record supports
Metro's conclusion because Plaintiffs cannot—and do
not—argue that the ad is accurate. *Id.* at 1171. Finally, the
rejection was viewpoint neutral because nothing in the record
suggests that Metro would accept the same inaccuracy in a
different ad or that Metro has accepted other ads containing
false statements. *Id.* In sum, Metro permissibly rejected
Plaintiffs' original ad on the ground of falsity, and we need
not reach the other two grounds for its rejection. *Id.* at 1172;
*accord SeaMAC*, 781 F.3d at 499. We therefore affirm the
district court's grant of summary judgment to the County on
Plaintiffs' challenge to Metro's rejection of their original ad.

Because Metro rejected Plaintiffs' revised ad on the grounds of disparagement and disruption, we next consider those standards.

B.  *Disparagement Standard*

The disparagement clause in Metro's transit advertising policy states that Metro will reject any ad that is:

> *Demeaning or Disparaging*.  Advertising that contains material that demeans or disparages an individual, group of individuals or entity. For purposes of determining whether an advertisement contains such material, the County will determine whether a reasonably prudent person, knowledgeable of the County's ridership and using prevailing community standards, would believe that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity or stature of any individual, group of individuals or entity.

Applying the Supreme Court's decision in *Matal*, we conclude that Metro's disparagement standard discriminates, on its face, on the basis of viewpoint.

In *Matal*, the Supreme Court considered a challenge to the Lanham Act's disparagement clause:  "This provision prohibits the registration of a trademark 'which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute.'" 137 S. Ct. at 1753 (quoting 15 U.S.C. § 1052(a)).  The plaintiff had sought registration for the name of his band,

"The Slants," which is a derogatory term for Asian-Americans that the plaintiff sought to "reclaim." *Id.* at 1754. A trademark official denied registration on the ground of disparagement, and the plaintiff filed suit. *Id.*

The Court held unanimously that the disparagement clause is facially invalid under the Free Speech Clause of the First Amendment. Two four-Justice opinions characterized some of the sub-issues differently. But all eight Justices (Justice Gorsuch was recused) held that offensive speech is, itself, a viewpoint and that the government engages in viewpoint discrimination when it suppresses speech on the ground that the speech offends. *See, e.g.*, *id.* at 1751 (plurality) ("[T]his provision violates the Free Speech Clause of the First Amendment. It offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend."); *id.* at 1763 (plurality) ("Giving offense is a viewpoint."); *id.* at 1766 (Kennedy, J., concurring) ("Within that category [of persons and other things described in the statute], an applicant may register a positive or benign mark but not a derogatory one. The law thus reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination.").

*Matal* applies with full force to the disparagement clause here. No material textual difference distinguishes Metro's disparagement clause from the trademark provision at issue in *Matal*. Metro's disparagement clause, like the Lanham Act's disparagement clause, requires the rejection of an ad solely because it offends. Giving offense is a viewpoint, so Metro's disparagement clause discriminates, on its face, on the basis of viewpoint.

Metro emphasizes that the disparagement clause applies equally to all proposed ads: none may give offense, regardless of its content. But the fact that no one may express a particular viewpoint—here, giving offense—does not alter the viewpoint-discriminatory nature of the regulation. The *Matal* plurality wrote:

> To be sure, the clause evenhandedly prohibits disparagement of all groups. It applies equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue. It denies registration to any mark that is offensive to a substantial percentage of the members of any group. But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint.

*Id.* at 1763 (plurality). And Justice Kennedy wrote:

> [The government] argues, to begin with, that the law is viewpoint neutral because it applies in equal measure to any trademark that demeans or offends. This misses the point. A subject that is first defined by content and then regulated or censored by mandating only one sort of comment is not viewpoint neutral. To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so.

*Id.* at 1766 (Kennedy, J., concurring).

It is true that this case involves a nonpublic forum, where the government generally has more leeway to restrict speech. But it is settled law that, in a nonpublic forum, regulations must be reasonable *and viewpoint neutral*. *E.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). In a nonpublic forum, "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Id.* We have noted that, in some instances, "[t]he line between an acceptable subject matter limitation and unconstitutional viewpoint discrimination is not a bright one." *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003). But we have little difficulty drawing the line here. Metro accepts ads on a wide range of subject matters, including terrorism, but denies access to Plaintiffs and anyone else if the proposed ad offends. We cannot conclude that the appropriate limitation on subject matter is "offensive speech" any more than we could conclude that an appropriate limitation on subject matter is "pro-life speech" or "pro-choice speech." All of those limitations exclude speech solely on the basis of viewpoint—an impermissible restriction in a nonpublic forum (as in other contexts). *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) ("By rejecting [the plaintiff's] application only on the ground of its [offensive] branding, defendants impermissibly discriminated against [the plaintiff's] viewpoint and therefore ran afoul of the First Amendment, whether [the plaintiff's] speech is categorized as commercial speech, speech in a public forum, or speech in a nonpublic forum." (citing *Matal*, 137 S. Ct. 1744)).

This case thus fundamentally differs from other First Amendment precedents on which the County relies, because the purported limitation on subject matter—

disparagement—facially discriminates on the basis of viewpoint.  In *Cogswell*, 347 F.3d at 811, we considered Seattle's requirement that a candidate limit statements in a voter's pamphlet to statements about himself or herself.  We upheld the regulation "[b]ecause Seattle has not restricted viewpoints on candidate self-discussion, the subject matter included in the forum."  *Id.* at 816.  Unlike disparagement, which is itself a viewpoint according to *Matal*, candidate self-discussion is facially viewpoint neutral.

The same analysis applies to the Supreme Court's decision in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 682–83 (1998).  There, the Court considered a candidate debate limited to candidates who had generated a sufficient level of public interest.  The Court held that the restriction was viewpoint neutral because it was "beyond dispute that [the plaintiff candidate] was excluded not because of his viewpoint but because he had generated no appreciable public interest."  *Id.* at 682.  Unlike disparagement, the level of public interest in a candidate is viewpoint neutral.

Similarly, in *Cornelius*, 473 U.S. at 811–12, the Court considered a public charity drive's exclusion of certain types of organizations.  The Court accepted that "a decision to exclude all advocacy groups, regardless of political or philosophical orientation, is by definition viewpoint neutral" and that "[e]xclusion of groups advocating the use of litigation is not viewpoint-based . . . because litigation is a means of promoting a viewpoint, not a viewpoint in itself."  *Id.*  Metro emphasizes the Court's distinction between "a means of promoting a viewpoint" and "a viewpoint in itself."  Metro asserts that, like the viewpoint-neutral restrictions on advocacy and litigation in *Cornelius*, Metro's disparagement

clause similarly restricts only a *means* of promoting a viewpoint, not the underlying viewpoint.  But unlike viewpoint-neutral restrictions on advocacy and litigation, a disparagement restriction is itself viewpoint discriminatory on its face, under *Matal*, even if the restriction also can be considered a limitation on the means of expressing an underlying viewpoint.

In sum, Metro's disparagement clause discriminates, on its face, on the basis of viewpoint.  The disparagement clause therefore cannot serve as a constitutionally valid basis for rejecting Plaintiffs' revised ad.[3]  We therefore turn to Metro's alternative reason to reject the revised ad:  feared disruption to the transit system.

C.  *Disruption Standard*

The disruption clause in Metro's transit advertising policy states that Metro will reject any ad that is:

> *Harmful or Disruptive to Transit System*. Advertising that contains material that is so objectionable as to be reasonably foreseeable that it will result in harm to, disruption of or interference with the transportation system. For purposes of determining whether an advertisement contains such material, the County will determine whether a reasonably prudent person, knowledgeable of the County's ridership and using prevailing

---

[3] "Because the restriction is viewpoint discriminatory, we need not decide whether it is unreasonable in light of the purposes served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001).

community standards, would believe that the material is so objectionable that it is reasonably foreseeable that it will result in harm to, disruption of or interference with the transportation system.

We previously upheld, as constitutionally valid on its face, an earlier version of the disruption clause. *SeaMAC*, 781 F.3d at 499–503. Although Metro made some minor changes to the clause after we decided *SeaMAC*, none affects the clause's facial constitutionality. As explained below, the present version of the disruption clause, like the earlier one, survives facial scrutiny.

The clause is reasonable in light of the forum's purpose because "[a]ny speech that will foreseeably result in harm to, disruption of, or interference with the transportation system is, by definition, incompatible with the buses' intended purpose": "safe and reliable public transportation." *Id.* at 500. The standard is also "sufficiently definite and objective to prevent arbitrary or discriminatory enforcement by County officials." *Id.* The clause's "ultimate criterion is an objective one: reasonably foreseeable harm to, disruption of, or interference with the transportation system. Thus, we are not left with the specter of a 'standardless standard' whose application will be immune from meaningful judicial review." *Id.* (quoting *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001)). Finally, the disruption clause "[o]n its face . . . is viewpoint neutral: It excludes all ads—whatever their viewpoint—that may foreseeably result in harm to, disruption of, or interference with the transportation system." *Id.* at 501–02.

We emphasize that *Matal* does not affect the facial constitutionality of the disruption clause. Although *Matal* instructs that Metro may not discriminate solely on the basis of viewpoint, the disruption clause discriminates on the permissible, viewpoint-neutral, and objective criterion of disruption to the transit system. That is, whether or not an ad is offensive (under a "reasonably prudent person" standard or otherwise), Metro may reject an ad if harm to the transit system is reasonably foreseeable.

Metro's rejection, however, must be borne out by the record: "We must independently review the record, without deference to the threat assessment made by County officials, to determine whether it shows that the asserted risks were real." *SeaMAC*, 781 F.3d at 500–01 (internal quotation marks and brackets omitted). Here, Metro submitted an expert's report describing the invidious nature of ads that depict only persons of a certain race or ethnicity as terrorists. Such ads may perpetuate harmful stereotypes and may upset riders which, in turn, may cause a decrease in ridership. Metro has concluded that, accordingly, it is reasonably foreseeable that Plaintiffs' ad will harm the transit system.

Determining whether it is "reasonably foreseeable" that the transit system will be harmed necessarily requires some level of speculation, and Metro's analysis has some foundation. Here, though, we have an unusual opportunity to test Metro's hypothesis. Metro approved a very similar ad—the State Department's own "Faces of Global Terrorism" ad—which actually ran for a period of nearly three weeks. During that time, Metro received a small number of complaints and expressions of concern, but Metro's transit system did not experience *any* harm, disruption, or

interference.**[4]**  Metro's concerns about Plaintiffs' ad apply equally to the State Department's ad, and Metro has not explained why it fears harm to the transit system from Plaintiffs' ad when no harm at all resulted from displaying the State Department's ad.  Applying the disruption standard without deference to Metro's assessment, we cannot conclude that a reasonably prudent person would reasonably foresee harm to the transit system from Plaintiffs' ad.  Accordingly, we hold that Metro's rejection of Plaintiffs' revised ad on the ground of disruption to the transit system was unreasonable.

Because neither of Metro's reasons for rejecting Plaintiffs' revised ad withstands First Amendment scrutiny, we reverse the district court's grant of summary judgment to the County and remand with instructions to enter summary judgment for Plaintiffs on this claim.  We stress that the First Amendment does not require Metro to tolerate harm to the transit system.  If the situation changes such that Metro reasonably fears harm, then it may reject, or cancel its approval of, Plaintiffs' ad.

**AFFIRMED in part; REVERSED in part and REMANDED with instructions.**  The parties shall bear their own costs on appeal.

---

**[4]** The problematic nature of the State Department's ad escaped the attention of Metro's professional staff whose job is to review ads for conformity with the policy.  Indeed, the person who approved the ad has been involved in the transit advertising program for more than 30 years, and she has reviewed submissions for precisely this type of problem "throughout [her] tenure."  She approved the ad without concern until, after receiving letters from community members, she "eventually came to understand" its troublesome nature.