RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0338p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER; ROBERT SPENCER,

　　　　　　　　　*Plaintiffs-Appellants*,

　　*v.*

SUBURBAN MOBILITY AUTHORITY FOR REGIONAL TRANSPORTATION (SMART); JOHN HERTEL, individually and in his official capacity as General Manager of SMART; BETH GIBBONS, individually and in her official capacity as Marketing Program Manager of SMART,

　　　　　　　　　*Defendants-Appellees*.

No. 19-1311

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-12134—Denise Page Hood, Chief District Judge.

Argued:  December 13, 2019

Decided and Filed:  October 23, 2020

Before: COLE, Chief Judge; SILER and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellants.  Christian E. Hildebrandt, VANDEVEER GARZIA, P.C., Troy, Michigan, for Appellees.  **ON BRIEF:**  Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, David Yerushalmi, AMERICAN FREEDOM LAW CENTER, Washington, D.C., for Appellants.  Christian E. Hildebrandt, VANDEVEER GARZIA, P.C., Troy, Michigan, Kirsten Silwanowicz, Ronald E. Beier, II, SUBURBAN MOBILITY AUTHORITY FOR REGIONAL TRANSPORTATION, Detroit, Michigan, for Appellees.

---

**OPINION**

---

MURPHY, Circuit Judge.   The Free Speech Clause limits the government's power to regulate speech on public property.   The government has little leeway to restrict speech in "public forums": properties like parks or streets that are open to speech by tradition or design.   It has wider latitude to restrict speech in "nonpublic forums" that have not been opened to debate.   Even there, however, speech restrictions must be reasonable and viewpoint neutral.   *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018).   In this case, we must consider how these rules apply to the restrictions that a public-transit authority imposes on parties who seek to display advertisements on its buses.   The American Freedom Defense Initiative sought to run an ad that said: "Fatwa on your head?  Is your family or community threatening you?  Leaving Islam?  Got Questions?  Get Answers!  RefugefromIslam.com."  Michigan's Suburban Mobility Authority for Regional Transportation (SMART) rejected this ad under two of its speech restrictions.   The first prohibits "political" ads; the second prohibits ads that would hold up a group of people to "scorn or ridicule."

Earlier in this case, we found, first, that the advertising space on SMART's buses is a nonpublic forum and, second, that SMART likely could show that its restrictions were reasonable and viewpoint neutral.   *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 890–96 (6th Cir. 2012).   Since then, the Supreme Court has issued a pair of decisions that compel us to change course on our second conclusion.   SMART's ban on "political" ads is unreasonable for the same reason that a state's ban on "political" apparel at polling places is unreasonable: SMART offers no "sensible basis for distinguishing what may come in from what must stay out."  *Mansky*, 138 S. Ct. at 1888.   Likewise, SMART's ban on ads that engage in "scorn or ridicule" is not viewpoint neutral for the same reason that a ban on trademarks that disparage people is not viewpoint neutral: For any group, "an applicant may [display] a positive or benign [ad] but not a derogatory one."  *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment); *id.* at 1763 (Alito,

J., opinion).   We thus reverse the district court's decision rejecting the First Amendment challenge to these two restrictions.

I

A

SMART, a government agency, manages a public-transportation system for the four counties in and around Detroit, Michigan.  It operates hundreds of buses that stop at dozens of bus shelters.  For a fee, parties may display advertisements on the inside and outside of SMART's buses and bus shelters.

In 2008, SMART contracted with a third party, CBS Outdoor, to manage the sale and placement of these ads.  Under this contract, SMART is guaranteed to make at least $500,000 per year from the ads.  It uses this money to help fund its approximately $130-million budget.  The contract includes "Advertising Guidelines" that regulate, among other things, the content of ads that may be placed on buses and bus shelters.  The Guidelines prohibit several types of ads, including "political" ads and ads that engage in "scorn or ridicule":

> In order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience, [CBS] shall not allow the following content:
>
> 1. Political or political campaign advertising.
>
> 2. Advertising promoting the sale of alcohol or tobacco.
>
> 3. Advertising that is false, misleading, or deceptive.
>
> 4. Advertising that is clearly defamatory or likely to hold up to scorn or ridicule any person or group of persons.
>
> 5. Advertising that is obscene or pornographic; or in advocacy of imminent lawlessness or unlawful violent action.

Contract, R.57-2, PageID#1011.  The contract requires CBS to obtain SMART's preapproval before displaying any ad that might violate these restrictions.

When a potential advertiser seeks to place an ad, it speaks with CBS about the logistics, including the pricing, timing, and available space.  If CBS believes that the ad might violate the Advertising Guidelines, it alerts SMART.  Beth Gibbons, a SMART marketing manager,

oversees the advertising program and receives these notices. Gibbons bears the initial responsibility to decide if a proposed ad violates an Advertising Guideline because, for example, it is "political." Although she may reject an ad on her own, she regularly seeks input from others at SMART, including its lawyers and ultimately its general manager.

Since 2008, SMART has placed hundreds of ads on its buses. The ads have not been purely commercial. SMART has allowed many issue-oriented ads. It permits "get out the vote drives" encouraging individuals to vote. It has run an ad picturing a county sheriff and prosecutor that asks individuals to report drunk drivers. And it has run public-health ads. Some approved ads have discouraged smoking with provocative pictures of a smoker who has had a tracheostomy. Others have advertised free birth control and family planning. Still others have encouraged HIV testing. A "status sexy" ad campaign, for example, identified "statussexy.com" as an address to find testing sites, displayed shirtless men in seductive poses, and stated things like "Knowing your HIV status shows confidence. That's always Sexy."

SMART has also allowed religious ads. It has approved an ad promoting services at a local church. And it has approved an ad by the Detroit Area Coalition of Reason asking "Don't believe in God? You are not alone.":



Members of the public and bus drivers complained about this atheist ad. Two buses displaying it were also vandalized (the "Don't" was scratched out). In response, SMART amended its website to state that "First Amendment free speech rights require that SMART not censor free speech and because of that, SMART is required to provide equal access to advertising on our vehicles." The website continued: "Advertising posted on SMART property does not always reflect the views or opinions of SMART, its employees or riders."

Of the hundreds of ads that SMART has been asked to display, it has rejected four under its Advertising Guidelines. The first concerned abortion. Pinckney Pro-Life sought to place an ad that asked "Hurting after Abortion?", displayed a picture of Jesus, identified a number to call for "Confidential Help," and listed two websites:



SMART deemed this ad "political" because the websites contained "pro-life information" advocating against abortion.

SMART also rejected an ad for a video game, "Red Dead Redemption," on a different ground. A character in the ad pointed a gun at onlookers, and SMART found that the ad violated its restriction prohibiting advocacy of unlawful violent action. SMART later approved the video-game ad without the gun.

B

This suit concerns the other two ads that SMART has rejected. In April 2010, Pamela Geller contacted CBS about her organization placing an ad on SMART buses. Geller and Robert Spencer cofounded the "American Freedom Defense Initiative" (AFDI) to engage in free-speech advocacy. AFDI's ad asked various questions ("Fatwa on your head?", "Is your family or community threatening you?", and "Leaving Islam?") and listed the website "RefugeFromIslam.com":



In May 2010, CBS sent this ad to Gibbons for SMART's review. Gibbons did not believe that it was "political." But she had learned from a newsletter that similar ads created controversy in Florida. So she forwarded the proposed ad to others in SMART's administration.

SMART's general manager, in coordination with Gibbons and others, decided to reject the ad. SMART found that the ad was "political" and that it engaged in "scorn or ridicule." SMART viewed the ad as "political" because "fatwa" referred to sharia law and because the website contained anti-Islamic commentary. SMART also found that the ad would likely hold people of the Islamic faith up to scorn or ridicule because it suggested that they might threaten their family members.

During this litigation, AFDI attempted to run a second ad mirroring the atheist ad that SMART had permitted:



SMART rejected this ad too because the content in the listed website was political. SMART did, however, offer to place this ad on its buses if AFDI removed the accompanying website.

C

AFDI, Geller, and Spencer (collectively, AFDI) sued SMART and various employees alleging that SMART's refusal to post the "fatwa" ad violated the First Amendment. The district court granted AFDI a preliminary injunction. It decided that SMART had created a nonpublic

forum, which allowed SMART to adopt reasonable, viewpoint-neutral restrictions. But the court found that AFDI was likely to show that SMART's ban on political ads was unreasonable because "there is nothing in the policy that can guide a government official to distinguish between permissible and impermissible advertisements in a non-arbitrary fashion."

We reversed this injunction on an interlocutory appeal. *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) (*AFDI*). Like the district court, we found that "the advertising space on SMART's buses" qualified as a "nonpublic forum." *Id.* at 890–91. Unlike the district court, we held that SMART would likely show that its speech restrictions were reasonable because political ads may offend riders and decrease revenue. *Id.* at 892–93. We added that "a person of ordinary intelligence can identify what is or is not political" and described the inquiry as a "reasonably objective exercise." *Id.* at 893–94.

Following discovery, both sides moved for summary judgment in 2013. In 2019, the district court granted summary judgment to SMART and denied it to AFDI. It hewed closely to our earlier decision. The court found that the ad space on SMART's buses was a nonpublic forum. It found that the ban on "political" advertising was reasonable because those ads could offend riders and because a reasonable person could distinguish "political" from "nonpolitical" ads. And it relied on similar rationales to uphold SMART's ban on ads that engage in scorn or ridicule.

II

We start with the ground rules. The First Amendment, as incorporated against the states by the Fourteenth, prohibits states from "abridging the freedom of speech." U.S. Const. amend. I. This text bars the government from "abridging" (that is, curtailing) speech. So the Supreme Court has long followed different rules for state actions that merely fail to *promote* speech as compared to those that affirmatively *regulate* it. *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358–59 (2009). The government's decision not to use public resources to facilitate a person's private speech does not automatically count as an "abridgment" of that person's speech. *See id.* And the government may sometimes make content-based speech distinctions when subsidizing

speech that would be impermissible were a "direct regulation of speech or a criminal penalty at stake." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998). Here, for example, it would raise grave constitutional concerns if SMART had sought to punish AFDI for its ad's message. *See Snyder v. Phelps*, 562 U.S. 443, 451–58 (2011). But SMART did no such thing. SMART only refused to allow AFDI to use public buses as government billboards for the message. That choice left AFDI free to proclaim its message in other ways without fear of criminal or civil reprisal. *Cf. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985).

At the same time, the Supreme Court has also long recognized that the government does not have complete discretion to regulate speech it does not like whenever it provides a public benefit. *See United States v. Kokinda*, 497 U.S. 720, 725–26 (1990) (plurality opinion). As the Court has said, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (*AOSI*) (citation omitted). The Court has adopted different types of rules for different types of speech.

Sometimes, the government uses public resources to proclaim a *government* message. When doing so, it may promote specific viewpoints at the expense of others because the Free Speech Clause "does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). It also may rely on private parties to convey this "governmental message," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), either by giving them funds to articulate it, *see Rust v. Sullivan*, 500 U.S. 173, 193 (1991), or by adopting their message as its own, *see Summum*, 555 U.S. at 470–71. However the government proclaims its message, this "government speech" does not compel it to subsidize opposing views. *Matal v. Tam*, 137 S. Ct. 1744, 1757–58 (2017) (Alito, J., opinion). During World War II, for example, its use of funds to promote the war effort did not trigger a duty to subsidize anti-war protests. *Id.* at 1758. (That said, the government does not have unrestrained power to regulate the speech of parties who implement its programs when they speak on their "own time and dime." *AOSI*, 570 U.S. at 218.)

Other times, the government uses public resources to promote *private* messages. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). It can facilitate the speech of private parties in various ways, ranging from subsidizing their speech with government funds, *see id.* at 542–44, to permitting them to speak on government-owned properties, *see Carey v. Brown*, 447 U.S. 455, 460–61 (1980). The government has less latitude to discriminate against private speakers when it uses public resources to create these sorts of speech "forums." *See Rosenberger*, 515 U.S. at 828–30. True, the "government's ownership of property does not automatically open that property to the public," *Kokinda*, 497 U.S. at 725 (plurality opinion), and "the government need not permit all forms of speech on property that it owns and controls," *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). Yet, unlike with government speech, "the government does not have a free hand to regulate private speech on government property." *Summum*, 555 U.S. at 469.

The restrictions that the government may impose on private speakers who seek to use public property for their speech depends on the type of "forum" that is at issue. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). The Supreme Court has recognized three types of forums: "traditional public forums, designated public forums, and nonpublic forums." *Id.* It has adopted two sets of rules for speech restrictions imposed within these forums. *See id.*

On the one hand, the Supreme Court instructs us to rigorously scrutinize speech restrictions in "traditional" or "designated" public forums. *Id.* Traditional public forums—like parks or sidewalks—have always "been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Summum*, 555 U.S. at 469 (citation omitted); *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). Designated public forums—like university facilities opened to students—are "spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose.'" *Mansky*, 138 S. Ct. at 1885 (citation omitted); *Widmar v. Vincent*, 454 U.S. 263, 267 (1981). In both forums, the government may not regulate the "content" of speech unless it can satisfy strict scrutiny. *Mansky*, 138 S. Ct. at 1885. A typically invalid content-based regulation "applies to particular speech because of the topic discussed or the idea or message expressed" (think of a sign regulation that treats political signs differently from religious signs). *Reed v. Town of Gilbert*,

576 U.S. 155, 163–64 (2015).  The government instead may generally impose only "time, place, and manner restrictions" on speech in these forums (think of a noise limit applying to all speech no matter its content).  *Mansky*, 138 S. Ct. at 1885; *see Ward v. Rock Against Racism*, 491 U.S. 781, 790–91 (1989).

On the other hand, the Supreme Court gives the government greater freedom to restrict speech in "nonpublic forums": properties that are "not by tradition or designation a forum for public communication."  *Mansky*, 138 S. Ct. at 1885 (citation omitted).  The Court has sometimes called these forums "limited public forums," but it has followed the same rules no matter the label.  *Compare id.*, *with Rosenberger*, 515 U.S. at 829.  Examples of nonpublic forums include everything from a school's internal mail facilities, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983), to a military base, *Greer v. Spock*, 424 U.S. 828, 831, 836–38 (1976), to a jail, *Adderley v. Florida*, 385 U.S. 39, 47–48 (1966).  In these forums, the government may make content-based distinctions that would largely be invalid in public forums.  The government, for example, may allow certain nonprofits to solicit donations from public employees for their health-and-welfare services, but prohibit other nonprofits from soliciting donations for their litigation services.  *Cornelius*, 473 U.S. at 807–08.  Even in nonpublic forums, however, the Supreme Court has set two limits on the government's ability to restrict speech.  The restriction must be "reasonable."  *Id.* at 806.  And the government may not engage in a more invidious kind of content discrimination known as "viewpoint discrimination." *Rosenberger*, 515 U.S. at 829.

III

SMART's refusal to display AFDI's fatwa ad raises two questions under these rules: (1) What type of speech or forum has SMART created with its advertising space? (2) Do SMART's speech restrictions meet the rules that apply to the speech and forum at issue?  We opt not to decide the first question (other than to clarify that the bus ads are not government speech) because SMART's restrictions fail even the more forgiving test that applies to nonpublic forums.

A.  Is SMART's advertising space a type of forum for private speech?

Our standard of review turns on the type of speech and forum.  The parties agree that SMART's advertising space falls on neither end of the speech spectrum that we discussed above. For its part, SMART makes no claim that the ads on its buses are "government speech" subject to no scrutiny under the Free Speech Clause.  *Summum*, 555 U.S. at 467.  SMART, for example, has not suggested that it was stating its own view when displaying an ad asking: "Don't believe in God?  You are not alone."  After that ad ran, SMART even placed a disclaimer on its website disavowing this misconception: "Advertising posted on SMART property does not always reflect the views or opinions of SMART[.]"  This disclaimer comports with the common understanding of bus advertisements.  The Supreme Court has noted that, unlike the license plate on a car, the "advertising space" on a bus is a "context" "traditionally available for private speech."  *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 218 (2015) (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)).

For its part, AFDI does not claim that the advertising space qualifies as a "traditional public forum" subject to rigorous scrutiny under the Free Speech Clause.  *Mansky*, 138 S. Ct. at 1885.  The Supreme Court's *Lehman* decision would foreclose such an argument.  *Lehman* concerned "advertising space" on the vehicles that a city used to operate a "public rapid transit system."  418 U.S. at 299 (plurality opinion).  The city refused to display a political candidate's campaign materials in that space.  *Id.* at 300–01.  The Court rejected a free-speech challenge to this refusal.  *Id.* at 303–04; *id.* at 308 (Douglas, J., concurring in the judgment).  The plurality explained that the city's "commercial venture" of transporting people bore no resemblance to a "meeting hall," "park," "street corner," or other area traditionally associated with public discourse.  *Id.* at 303.

The parties' agreement narrows the range of debate to the other two forums: Is SMART's advertising space a designated public forum (triggering more rigorous judicial scrutiny) or a nonpublic forum (triggering more forgiving judicial scrutiny)?  The Supreme Court has held that designated public forums must be "created by purposeful governmental action," not by accident. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998).  Yet the government need not officially announce that it has created a debating forum.  To decide if the government has

done so, we look both to the government's formal "policy" (what guidelines has it set for speech?) and its actual "practice" (what speech has it permitted?). *Cornelius*, 473 U.S. at 802. We also consider the "nature of the property" and its suitability as a place for discourse. *Id.*

In the bus-advertisement context, the distinction between designated public forums and nonpublic forums has "proved difficult" to draw. *Am. Freedom Def. Initiative v. King County*, 136 S. Ct. 1022, 1024–26 (2016) (Thomas, J., dissenting from the denial of certiorari) (citing cases). In this case, we lean toward viewing SMART's advertising space as a nonpublic forum for the reasons we explained at the preliminary-injunction stage. *AFDI*, 698 F.3d at 890–92. Most notably, SMART's formal policies bar political and political-campaign ads, a limit incompatible with an intent to create a public forum. *Id.* The cases treating advertising space as a public forum, by contrast, typically involve policies allowing a range of "political and public-issue speech." *United Food & Com. Workers Union v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998); *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 252 (3d Cir. 1998); *N.Y. Mag. v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998); *Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*, 767 F.2d 1225, 1232 (7th Cir. 1985). Like the city in *Lehman*, SMART also seeks to "provide rapid, convenient, pleasant, and inexpensive service to the commuters" riding its buses. 418 U.S. at 303 (plurality opinion). It created this advertising space to further these business goals, not to promote public debate. *AFDI*, 698 F.3d at 892.

That said, discovery has revealed some factors that could cut the other way. For example, while SMART's Advertising Guidelines exist to avoid imposing on a captive audience, it conceded that the atheist ad was not an example of "erratic" enforcement and that it would air this ad today. *Id.* (citation omitted). Indeed, SMART responded with a free-speech defense when people complained about this ad, noting that "First Amendment free speech rights require that SMART not censor free speech[.]" SMART has also rejected only three ads as "political" and has displayed many "public-issue" ads, including the "status sexy" ads, the ads promoting contraception, and the ads discouraging smoking. *See United Food*, 163 F.3d at 354; *cf. Ne. Pa. Freethought Soc'y v. Cnty. of Lackawana Transit Sys.*, 938 F.3d 424, 437 n.2 (3d Cir. 2019).

In the end, we need not resolve this question. SMART's Advertising Guidelines violate the Free Speech Clause even under the more forgiving review that applies to nonpublic forums.

B. Do SMART's Advertising Guidelines satisfy the rules for nonpublic forums?

Speech restrictions in nonpublic forums must be reasonable and viewpoint neutral. *Mansky*, 138 S. Ct. at 1885. We previously held that SMART likely could show that its restrictions met this test. *AFDI*, 698 F.3d at 892–94. But the Supreme Court has since clarified both the reasonableness requirement, *Mansky*, 138 S. Ct. at 1888–92, and the viewpoint-neutrality requirement, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). This intervening authority shows that SMART's ban on "political" ads is not reasonable and that its ban on ads engaging in "scorn or ridicule" is not viewpoint neutral. As written, these restrictions violate the First Amendment.

1. Is SMART's restriction on "political" advertising reasonable?

SMART rejected AFDI's fatwa ad under its ban on "political" ads. Yet *Mansky* compels us to hold that SMART's opaque definition of "political" is unreasonable. 138 S. Ct. at 1888–92.

When granting the government leeway to restrict speech in nonpublic forums, the Supreme Court cautioned that "the government must act reasonably in imposing such restrictions." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 n.7 (1981). The Court has gradually given content to this reasonableness requirement. It has told us not to consider a restriction's reasonableness in the abstract, but "in light of the purpose served by" the forum. *Cornelius*, 473 U.S. at 806. And it has told us that the government need not show a "strict incompatibility" between the speech it prohibits and the purpose of the forum. *Id.* at 808. The requirement thus demands far less than the strict-scrutiny test for public forums. The government's reasons for imposing a restriction (its ultimate *ends*) need not be "compelling." *Id.* They need only be "permissible." *Mansky*, 138 S. Ct. at 1886. And a restriction need not be "narrowly tailored" (the least restrictive *means*) to achieve those ends. *Cornelius*, 473 U.S. at 809. The restriction need only offer a "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1888.

*Mansky* shows how this test applies to a speech restriction analogous to the one at issue here. That case addressed a Minnesota law that banned voters from wearing "political" apparel at polling places. *Id.* at 1883. The Court treated polling places as nonpublic forums. *Id.* at 1885–86. When applying this reasonableness test, it found that Minnesota had pursued permissible *ends* because the state could reasonably seek to reinforce the solemnity of voting. *Id.* at 1887–88. Voters "reach considered decisions about their government," and states can reasonably conclude that the location of this "weighty civic act" should be free of "partisan discord." *Id.*

But the Court next held that Minnesota had not used reasonable *means* to implement these ends because its ban on "political" apparel was not "capable of reasoned application." *Id.* at 1892. On its face, the word "political" has no clear meaning. *Id.* at 1888–89. Although it can have a broad reach, Minnesota interpreted it more narrowly to cover only those messages that a reasonable observer would view as related to the electoral choices in a given election. *Id.* Yet a separate law already banned campaign materials. *Id.* at 1889. This "political" ban thus covered more: things like "issues" on which a candidate had taken a stance or "groups" that had political views. *Id.* at 1889–90. That ambiguous definition, however, "pose[d] riddles that even the State's top lawyers struggle[d] to solve." *Id.* at 1891. The lawyers suggested, for example, that a shirt with the Second Amendment's words would be "political," but a shirt with the First Amendment's words would not be. *Id.* These nonobvious distinctions led the Court to conclude that the "political" ban could not be objectively applied. Instead, the ban gave election judges at each polling place too much "discretion" to decide what qualified as "political." *Id.* The Court concluded that states "must employ a more discernible approach than the one Minnesota has offered here." *Id.*

SMART has failed to adopt a "more discernible approach." To be sure, like the law in *Mansky*, SMART's ban on "political" ads serves "permissible" ends. *Id.* at 1886. SMART seeks "to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience[.]" Contract, R.57-2, PageID#1011. *Lehman* found similar objectives permissible. 418 U.S. at 303–04 (plurality opinion); *id.* at 308 (Douglas, J., concurring in the judgment); *Cornelius*, 473 U.S. at 809–10. Nevertheless, SMART must adopt "objective,

workable standards" to achieve its permissible ends. *Mansky*, 138 S. Ct. at 1891. And like the law in *Mansky*, SMART's speech restriction combines the same "unmoored use of the term 'political'" with the same risk of "haphazard interpretations." *Id.* at 1888.

*First*, SMART cannot rely on its Advertising Guidelines' unadorned use of the word "political" to create workable standards by itself. The word has a range of meanings. It can have an "expansive" reach, covering "anything '[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state.'" *Id.* (citation omitted); *American Heritage Dictionary* 1364 (5th ed. 2011). SMART, however, does not follow this broad reading. Under this definition, even get-out-the-vote drives or public-service announcements encouraging individuals to report drunk drivers would qualify. *Mansky*, 138 S. Ct. at 1888. Yet SMART allows such public-issue ads.

The word alternatively can have a narrower reach, covering anything "[r]elating to, involving, or characteristic of political parties or politicians: *a political campaign*." *American Heritage Dictionary*, *supra*, at 1364. But SMART does not interpret the word this way either. Recall that its Advertising Guidelines bar "[p]olitical or *political campaign* advertising." Contract, R.57-2, PageID#1011 (emphasis added). SMART's ban on "political campaign" ads already covers ads associated with elections, including materials for candidates (Vote for Harry Lehman) or initiatives (Vote for the School Levy). *See Lehman*, 418 U.S. at 299–300 (plurality opinion). Given this separate ban on campaign ads, SMART interprets the ban on "political" ads to cover something *more* than these traditional election materials. *Cf. Mansky*, 138 S. Ct. at 1889.

*Second*, SMART cannot rely on any official guidance to create workable standards. Apart from its Advertising Guidelines, SMART has no other sources defining the word "political" or telling officials how to apply it. Start with substance: What does "political" mean? Before this suit, SMART had no training manuals explaining the term. That lack of guidance has caused inconsistency in how SMART agents define it. At the preliminary-injunction hearing, SMART's counsel recited the term's dictionary definition: of or related to government or politics. Hr'g, R.34, PageID#415. Yet Beth Gibbons, the initial reviewer of ads, could identify no factors other than "common sense" to decide if something was political. Gibbons Dep.,

R.57-8, PageID#1054.  She conceded: "All of these are not necessarily black-and-white issues, and not necessarily clean decisions."  *Id.*, PageID#1055.  Another official, by contrast, suggested that an issue was political if it was a "hotly-contended matter in the media[.]"  Dryden Dep., R.62-4, PageID#1533.  This lack of clarity led to differing views even in this case.  While SMART decided that AFDI's fatwa ad was political, Gibbons did not think it was.

Turn to process.  How should officials decide if an ad is political?  Should they limit themselves to an ad's four corners?  Or should they consider related content like information on websites?  No official guidance answers these questions either.  And we again see inconsistencies.  SMART does not review the content of advertised shows, movies, or books, but claims to review the content of websites listed on ads.  Yet SMART has not been consistent even there.  When SMART has rejected ads, it has highlighted information on websites.  It rejected the Pinckney Pro-Life ad that offered "Confidential Help" for those who have had an abortion because the listed websites contained "pro-life information" discouraging abortion.  Chubb Dep., R.57-15, PageID#1134.  When, by contrast, SMART has accepted ads, it is not clear it has reviewed listed websites.  Gibbons, for example, testified at the preliminary-injunction stage that SMART had looked to nothing extrinsic to the atheist ad displayed by the Detroit Area Coalition of Reason.  Hr'g, R.34, PageID#375–76.  Later, however, SMART's official designee claimed that SMART had looked at the website.  Chubb Dep., R.57-15, PageID#1127.  Regardless, the Detroit Area Coalition of Reason's website says that it promotes "separation of state and church activism."  Exh., R.58-4, PageID#1329.  SMART conceded that this topic was political but aired the ad nonetheless.  Chubb Dep., R.57-15, PageID#1127.

*Third*, SMART's made-for-litigation definition of "political" also cannot provide workable standards.  When asked to give SMART's official definition, its designee defined the word as "any advocacy of a position of any politicized issue."  Chubb Dep., R.57-15, PageID#1116.  The designee defined the word "politicized" this way: "[I]f society is fractured on an issue and factions of society have taken up positions on it that are not in agreement, it's politicized."  *Id.*  He added that an ad must be "advocacy of one of those viewpoints on the issue."  *Id.*, PageID#1119.  We think that this definition is subject to the same risk of "haphazard interpretations" that *Mansky* found unacceptable.  138 S. Ct. at 1888; *see also Ctr. for*

*Investigative Reporting v. Se. Pa. Transp. Auth.*, __ F.3d __, 2020 WL 5509709, at \*9 (3d Cir. Sept. 14, 2020).

Measure the ad from the Detroit Area Coalition of Reason against this definition. Are factions of society fractured on the existence of God, such that members of society have taken up different positions on the issue? Yes, a range of views exists. Does this ad "advocate" for one of those views? One could reasonably read it as promoting the view that God does not exist. In fact, members of the public complained about the ad and drivers refused to drive buses displaying it. When one considers that the Detroit Area Coalition of Reason advocates for the separation of church and state, it is not at all clear why SMART's definition permits this ad.

Or consider the advertisement from a public agency promoting free birth control. As litigation in the Supreme Court shows, some members of our society do not approve of the use of contraception. *See Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2376 (2020). We thus asked counsel at argument why SMART found that this ad did not advocate for a position on an issue on which members of society disagree. Counsel responded that the ad "wasn't promoting contraceptives" because it was only "informing people from a commercial standpoint" of their availability. Oral Arg. 16:16–26. When asked if Planned Parenthood could place a similar ad informing people from a "commercial standpoint" that it offers abortion services, counsel responded that the ad would be impermissibly political. *Id.* at 16:36–54. Counsel justified this seeming contradiction on the ground that Planned Parenthood was associated with abortion advocacy, not just services. *Id.* at 17:42–18:05. Yet this distinction—which seems to rest on whether an advertiser's "political positions are sufficiently 'well-known,'" *Mansky*, 138 S. Ct. at 1890—is nowhere to be found in SMART's definition. And counsel clarified that SMART would permit the name "Planned Parenthood" alone in ads even if members of society objectively associate the name with abortion advocacy. Oral Arg. 18:17–41.

Any number of hypotheticals could further demonstrate the risk of subjective enforcement. Consider Nike's well-known ad campaign with a picture of Colin Kaepernick and the caption "Believe in something. Even if it means sacrificing everything." Does this ad impliedly advocate for an issue on which factions of society disagree? SMART's counsel

thought not because its language does not articulate any point of view.  Oral Arg. 22:42–23:30.  How about a "Blue Lives Matter" ad?  Counsel thought it did.  *Id.* at 23:36–50; *cf. Ctr. for Investigative Reporting*, 2020 WL 5509709, at *9.  Must an ad expressly advocate for a position?  Or does implied advocacy count?  And whose perspective matters?  The reasonable commuter's?  SMART has no official guidance answering any of these basic enforcement questions.

If read literally, SMART's definition also could take the "political" out of political.  Its definition severs the word from its roots in government or politics by asking if people in society disagree on an *issue*, not on *government* or *politics*.  There are plenty of nonpolitical issues on which members of society disagree.  During fall in the Midwest, there is perhaps no bigger point of contention in Ohio and Michigan than the Ohio State-Michigan football game.  SMART's counsel conceded that "Go Bucks" or "Go Blue" advertisements would be acceptable.  Oral Arg. 15:10–50.  He explained that SMART's official designee, "in the heat of the moment," had not "completely" articulated SMART's official definition of "political" when explaining that it covers advocacy on things on which factions of society disagree.  *Id.* at 22:15–40.

That is precisely the First Amendment problem.  Up to now, SMART has not written down "objective, workable standards" to define the word "political" and guide officials on the steps to take when deciding if specific ads qualify.  *Mansky*, 138 S. Ct. at 1891.  Officials thus have had to apply the ban on the fly on a "case-by-case basis."  Dryden Dep., R.62-4, PageID#1533.  But the subjective enforcement of an "indeterminate prohibition" increases the "opportunity for abuse" in its application.  *Mansky*, 138 S. Ct. at 1891.  The First Amendment favors rules over standards because the former make an administrator's job largely ministerial whereas the latter leave room for the administrator to rely on "impermissible factors."  *United Food*, 163 F.3d at 359.  And "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use."  *Id.* (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)).  As in *Mansky*, we do not question that SMART seeks to act in an "evenhanded manner," but it has yet to create the workable standards that it needs for "reasoned application" of its ban.  138 S. Ct. at 1891–92.

This conclusion is reinforced by the way that other circuits have interpreted *Mansky*.  The Third Circuit recently considered a challenge to a public-transit system's ban on "advertisements

that are political in nature or discuss matters of public debate[.]" *Ctr. for Investigative Reporting*, 2020 WL 5509709, at *1. The court held that this ban was unreasonable in light of *Mansky* because the ban was "susceptible to erratic application." *Id.* at *9. The Ninth Circuit has similarly questioned the validity of a public-transit system's ban on "public issue" ads because that "broadly phrased policy" failed to provide enough guidance to administrators who must enforce it. *See Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 654–55 (9th Cir. 2019); *see also Ne. Pa. Freethought Soc'y*, 938 F.3d at 440–41; *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 371–73 (D.C. Cir. 2018).

SMART's responses do not change things. It relies primarily on our preliminary-injunction opinion, which reasoned that "merely because it is sometimes unclear whether an ad is political does not mean the distinction cannot be drawn" and that "a person of ordinary intelligence can identify what is or is not political." *AFDI*, 698 F.3d at 893. This logic conflicts with *Mansky*. It found a similarly "unmoored use of the term 'political,'" 138 S. Ct. at 1888, to be "[in]capable of reasoned application," *id.* at 1892, because of its "indeterminate scope," *id.* at 1889. At bottom, our earlier opinion interpreted the Supreme Court's prior cases about nonpublic forums as allowing the government to draw "fine lines" on a case-by-case basis. *AFDI*, 698 F.3d at 893. But *Mansky* now clarifies that this reasonableness requirement for nonpublic forums has greater teeth and compels states to adopt "a more discernible approach." 138 S. Ct. at 1891.

So SMART is left attempting to distinguish *Mansky*. It notes that *Mansky* did not hold that *any* definition of "political" was too broad. *Mansky*, for example, seemingly approved of bans on political-campaign materials concerning a candidate running for an election. 138 S. Ct. at 1891. Nothing we say here conflicts with that conclusion. AFDI does not challenge SMART's separate restriction on "political campaign" advertising, and that restriction will remain in place no matter how we rule. SMART next notes that the Minnesota law permitted for arbitrary enforcement because many different election judges would enforce the state's ban and they could have many different views of what counted as "political." *Id.* SMART officials in this case, by contrast, can keep tighter control over the enforcement of its "political" ban.

Yet *Mansky* "did not limit its holding to polling locations." *Ctr. for Investigative Reporting*, 2020 WL 5509709, at *9. And SMART's Advertising Guidelines contain the same basic problems that *Mansky* identified: They adopt an amorphous ban on "political" speech that cannot be objectively applied.

### 2. Is the scorn-or-ridicule restriction viewpoint neutral?

SMART alternatively rejected AFDI's fatwa ad under a restriction prohibiting ads that could hold a group of people up to "scorn or ridicule." *Matal* shows that this rationale has a free-speech problem of its own: It discriminates on the basis of viewpoint. *See* 137 S. Ct. at 1763 (Alito, J., opinion); *id.* at 1766 (Kennedy, J., concurring in part and concurring in the judgment).

The Supreme Court has always distinguished *content* discrimination that is permissible in nonpublic forums from *viewpoint* discrimination that is impermissible. The government may reserve nonpublic forums for speech on certain subjects while banning speech on other subjects. *Mansky*, 138 S. Ct. at 1885–86. It may, for example, ban all political campaigning on a military base even if it allows speakers to discuss other things. *Greer*, 424 U.S. at 831, 838–40. But the government may not go further by prohibiting specific viewpoints on the topics that it allows. *Rosenberger*, 515 U.S. at 829–30. If, for example, the government had allowed political campaigning on a military base and banned only one candidate's campaigning because of the candidate's "political views," that targeted ban would have violated the First Amendment. *Greer*, 424 U.S. at 838–39. In *Greer*, therefore, the Court made sure to clarify that the government had "objectively and evenhandedly applied" the ban before finding it constitutional. *Id.* at 839.

The Supreme Court reviews this type of viewpoint discrimination with greater skepticism than it reviews ordinary content discrimination because it raises greater First Amendment red flags. Viewpoint discrimination is an "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. When the government discriminates based on viewpoint, it does not neutrally treat an entire subject as off limits. It permits some private speech on the subject and only disfavors certain points of view. *Id.* This discrimination suggests that the government's speech restriction is not designed to preserve a government-owned property "for the use to which it is

lawfully dedicated." *Adderley*, 385 U.S. at 47. After all, the government allows other speakers to express their private views, so the government's own enforcement practices show that speech on the topic is not incompatible with the forum. Viewpoint discrimination instead suggests that the government seeks to accomplish something else entirely: the "official suppression of ideas[.]" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). And that suppression cuts to the core of the First Amendment. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Yet it can often prove difficult to distinguish ordinary "content" discrimination (restricting all speech on a subject) from the more troubling "viewpoint" discrimination (restricting a particular message on a subject). *See Rosenberger*, 515 U.S. at 830–31. Viewpoint discrimination obviously exists when the government allows speech conveying one point of view (say, speech promoting a President's "policy on aid to inner cities") but prohibits speech conveying the opposite point of view (say, speech criticizing that policy). *See R.A.V.*, 505 U.S. at 388. The Court has recognized, however, that not all debate is so "bipolar" (with only a "for" and "against" position) and that most topics will include a range of different viewpoints. *See Rosenberger*, 515 U.S. at 831. That recognition, combined with the heightened First Amendment concerns, has led the Court to define viewpoint discrimination in a "broad" manner. *Matal*, 137 S. Ct. at 1763 (Alito, J., opinion).

The Court has held that viewpoint discrimination exists even when the government does not target a narrow view on a narrow subject and instead enacts a more general restriction—such as a ban on all "religious" speech or on all "offensive" speech. *See Iancu*, 139 S. Ct. at 2300–01; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993). Consider first its cases on religion. On its face, a ban on religious speech could be viewed as content based (e.g., prohibiting all speech about religion) rather than viewpoint based (e.g., prohibiting speech taking a certain view on religion). *See Lamb's Chapel*, 508 U.S. at 393. Yet the Court has repeatedly rejected that reasoning. *Id.* at 393–94; *see also, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 109–12 (2001); *Rosenberger*, 515 U.S. at 831–32. In *Lamb's Chapel*, for example, it held that a ban on the use of school buildings for "religious purposes"

discriminated on the basis of viewpoint when the government allowed the use of those buildings for other civic purposes. *Id.* It reached this conclusion by examining the speech that a religious group had sought to express—speech discussing "family and child-rearing issues." *Id.* at 387. Other groups could discuss these subjects from other perspectives, so the ban targeted discussion of those subjects solely from a "religious perspective." *Id.* at 394. That was impermissible viewpoint discrimination. *Id.*

The Court applied this same logic when holding that "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu*, 139 S. Ct. at 2301 (quoting *Matal*, 137 S. Ct. at 1751 (Alito, J., opinion)). *Matal* illustrates this point. The Lanham Act bars federal trademark registration for any mark that would "'disparage . . . or bring . . . into contemp[t] or disrepute' any 'persons, living or dead.'" *Matal*, 137 S. Ct. at 1751 (quoting 15 U.S.C. § 1052(a)). On its face, this ban could be viewed as "evenhandedly prohibit[ing] disparagement of all groups," whether Democrats or Republicans, capitalists or socialists, or "those arrayed on both sides" of any other topic. *Id.* at 1763 (Alito, J., opinion). Yet the Court did not view it that way. The Justices divided equally over whether this anti-disparagement statute imposed "a condition on a government benefit" (trademark registration) or "a simple restriction on speech." *Iancu*, 139 S. Ct. at 2298–99. But they all "agreed that the provision violated the First Amendment because it discriminated on the basis of viewpoint." *Id.* at 2297. Justice Alito's opinion for four Justices reasoned that the Court's "cases use the term 'viewpoint' discrimination in a broad sense[.]" *Matal*, 137 S. Ct. at 1763 (Alito, J., opinion) (quoting *Rosenberger*, 515 U.S. at 831). And the anti-disparagement statute was viewpoint discriminatory in that broad sense because "[g]iving offense is a viewpoint." *Id.* Justice Kennedy's opinion for four Justices agreed, but considered the issue from the perspective of any "subject category" (under this statute, any group of people). *Id.* at 1766 (Kennedy, J., concurring in part and concurring in the judgment). The statute allowed a party to "register a positive" mark about the group "but not a derogatory one." *Id.* It thus "singled out a subset of messages" on that subject "for disfavor based on the views expressed." *Id.*

SMART's scorn-or-ridicule ban in this case cannot survive this broader understanding of viewpoint discrimination. Like the trademark statute prohibiting marks that bring individuals

into "disrepute," 15 U.S.C. § 1052(a), SMART's restriction prohibits ads that are "likely to hold up to scorn or ridicule any person or group of persons." This restriction necessarily discriminates between viewpoints. For any group, the restriction facially "distinguishes between two opposed sets of ideas": those that promote the group and those that disparage it. *Iancu*, 139 S. Ct. at 2300. SMART has applied its restriction in the same way. It, for example, has run an ad that promotes attendance at a local church. But the scorn-and-ridicule guideline would compel SMART to ban an ad ridiculing those who attend this church. Similarly, SMART conceded that an ad implying that Islam is a "religion of peace" likely would not violate its scorn-or-ridicule restriction. Yet SMART found that AFDI's ad violated the restriction because it implied that Islam was violent by suggesting that members of the faith would threaten family members. On its face and as applied, therefore, SMART's restriction engages in impermissible viewpoint discrimination. *Cf. id.* at 2300–01.

We are not alone in interpreting *Matal* in this fashion. The Ninth Circuit has reached a similar conclusion when considering speech restrictions by a public-transit authority in the Seattle area. *Am. Freedom Def. Initiative v. King County*, 904 F.3d 1126, 1130–33 (9th Cir. 2018). That entity prohibited bus advertisements that demeaned or disparaged groups. *Id.* at 1130–31. The Ninth Circuit held that "*Matal* applies with full force" to the clause, which discriminated on the basis of viewpoint. *Id.* at 1131. Because speech restrictions in a nonpublic forum must be viewpoint neutral, the court went on to find that this clause violated the First Amendment. *Id.* at 1132; *see also, e.g.*, *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30–33 (2d Cir. 2018).

SMART's two counterarguments cannot save this restriction. It relies on a pre-*Matal* decision from the First Circuit holding that a restriction prohibiting "demeaning or disparaging ads" did not discriminate based on viewpoint. *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 90–91 (1st Cir. 2004). But *Ridley* relied on logic—that a ban on "disparaging" speech neutrally applied to each side on any given topic, *see* 390 F.3d at 91—that all of the Justices rejected in *Matal*. Even though an anti-disparagement clause "evenhandedly prohibits disparagement of all groups," Justice Alito's opinion reasoned, it engages in viewpoint discrimination. *Matal*, 137 S. Ct. at 1763 (Alito, J., opinion). Justice Kennedy's opinion likewise rejected this argument

that the law was viewpoint neutral because it barred all sides on a topic from disparaging opponents: "To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so." *Id.* at 1766 (Kennedy, J., concurring in part and concurring in the judgment). *Ridley* does not survive *Matal*'s unanimous logic.

SMART thus seeks to distinguish *Matal*. Because *Matal* addressed trademarks, SMART argues, it "did not perform a forum analysis" or "recognize the government's interest to reasonably limit speech in a nonpublic forum." Appellee Br. 46. This distinction does not hold up. For decades, the Supreme Court has said that even in nonpublic forums—the forums in which the government has the most leeway to regulate speech—the government may still not engage in viewpoint discrimination. *See, e.g.*, *Cornelius*, 473 U.S. at 806. *Matal*'s reasoning about what qualifies as "viewpoint" discrimination thus has relevance here whether or not it addressed a nonpublic forum. SMART identifies no case suggesting that the meaning of "viewpoint discrimination" can change depending on the context in which it is used.

\*   \*   \*

Like the speech regulations in *Mansky* and *Matal*, SMART's two restrictions in this case are "understandable." *Iancu*, 139 S. Ct. at 2301; *see Mansky*, 138 S. Ct. at 1892. SMART sells advertising space to generate revenue, not to lose it. And political ads that advocate for positions with which large segments of SMART's customer base disagree or that disparage large segments of that base might well cause some to choose other transit options. *See AFDI*, 698 F.3d at 892. But our response to these concerns can be no different from the Supreme Court's response to them. As the Court made clear in *Mansky*, SMART must "strike the balance" between protecting its riders' tranquility and its advertisers' expression in a way that permits "reasoned application." *Mansky*, 138 S. Ct. at 1892. And "as the Court made clear in [*Matal*], a [speech restriction] disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu*, 139 S. Ct. at 2301 (quoting *Matal*, 137 S. Ct. at 1751 (Alito, J., opinion)).

Yet we also reiterate, as the Court did in *Mansky*, that we "do not pass on the constitutionality of" different speech restrictions that have attempted to strike this balance in other ways. 138 S. Ct. at 1891. As noted, for example, we do not address SMART's distinct ban on political-campaign materials. *Cf. id.* We also do not address advertising guidelines that contain both a definition of "political" and standards for determining if a given ad qualifies in "more lucid terms." *Cf. id.* And we do not address other types of speech restrictions, such as those permitting only commercial speech, *cf. Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 979 (9th Cir. 1998), or those prohibiting "vulgar" or "profane" terms, *cf. Iancu*, 139 S. Ct. at 2303 (Alito, J., concurring); *id.* (Roberts, C.J., concurring). We address only the two speech restrictions that are at issue here. *Mansky*, 138 S. Ct. at 1891. As to them, *Mansky* and *Matal* leave no doubt that they violate the Free Speech Clause. Since the parties have not briefed the proper remedy for these First Amendment violations, we leave that issue for the district court on remand. *Cf. Ctr. for Investigative Reporting*, 2020 WL 5509709, at \*10 & n.5.

We reverse and remand for proceedings consistent with this opinion.